# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| SEVIER COUNTY SCHOOLS FEDERAL CREDIT UNION et al., | ) ) ) | Case No. 3:19-cv-138 |
| *Plaintiffs,* | ) ) | Judge Travis R. McDonough |
| v. | ) ) | Magistrate Judge H. Bruce Guyton |
| BRANCH BANKING & TRUST COMPANY, | ) ) ) | |
| *Defendant.* | ) ) | |

## MEMORANDUM OPINION

Before the Court is Defendant Branch Banking & Trust Company's ("BB&T") motion to dismiss and compel arbitration (Doc. 12). For the following reasons, BB&T's motion (*id.*) will be **GRANTED**.

## I. BACKGROUND[1]

BB&T is a bank organized under the laws of North Carolina, with branches in many locations, including Sevier County, Tennessee. (Doc. 13, at 2.) Plaintiffs are current or former

---

[1] As a preliminary matter, the Court will address Plaintiffs' argument that the exhibits submitted in support of BB&T's motion (Docs. 12-1, 12-2, 12-3, 12-4, 12-5, 12-6) are inadmissible and should not be considered by this Court. (*See* Doc. 28, at 31–33.) Plaintiffs argue that certain portions of the Declaration of BB&T's Vice President, Christopher Powell, should be disregarded because he (1) "does not establish that he has personal knowledge" regarding the issuance of certain documents, (2) "does not state that he worked at BB&T" during all of the relevant time periods, and (3) "does not claim to have examined any records establishing" the issuance of certain documents. (*Id.* at 32.) However, Mr. Powell's declaration specifically states that the facts stated therein "are based on personal knowledge obtained from my personal review of the files, documents, and information of BB&T." (Doc. 12-1, at 2.) The Court is satisfied with this statement of Mr. Powell's basis of knowledge and will consider his declaration and the accompanying documents in its review of Defendant's motion. *See* Fed. R. Evid. 602, 901 (witness testimony can prove personal knowledge and authenticity of evidence).

account holders with BB&T.  (*Id.*; Doc. 1-1, at 5.)  Plaintiff Sevier County Schools Federal

Credit Union is a non-profit organization located in Sevier County, Tennessee.  (Doc. 1-1, at 4.)

The remaining named plaintiffs are persons residing in Sevier County, Tennessee.  (*Id.* at 4–5.)

### A.  Plaintiffs' Accounts with First National Bank of Gatlinburg

Beginning in 1989, Plaintiffs opened Money Market Investment Accounts ("MMIAs")

with First National Bank of Gatlinburg ("FNB").  (*Id.* at 7.)  FNB advertised the MMIAs to have

a rate of return guaranteed never to fall below 6.5%, subject to the account holder's compliance

with certain requirements.  (*Id.* at 7, 15.)  Upon opening an MMIA, each plaintiff signed an

agreement ("MMIA Agreement") with FNB.  (*Id.* at 7; Doc. 13, at 2.)  Each MMIA Agreement

reserved to FNB the right to change its terms:

> Changes in the terms of this agreement may be made by the financial institution
> from time to time and shall become effective upon the earlier of (a) the expiration
> of a thirty-day period of posting such changes in the financial institution, or (b)
> the mailing or delivery of notice thereof to the depositor by the notice in the
> depositor's monthly statement for one month.

(Doc. 12-2, at 2; Doc. 13, at 2.)

On or about January 22, 1992, FNB sent letters to MMIA-holders, notifying them that

FNB would no longer maintain the 6.5% rate of return due to economic pressures.  (Doc. 1-1, at

8, 21.)  In response to backlash from MMIA-holders, FNB circulated another letter on February

21, 1992.  (*Id.* at 8, 22.)  The February 21, 1992 letter announced that MMIAs would be

discontinued on March 31, 1992, and that existing MMIAs would be closed.  (*Id.* at 22.)

However, FNB offered to transfer "all or any portion of [the] funds to any other account or a

combination of accounts," and provided the following options:  (1) account holders could put

their funds in "New Money Market Investment Accounts" with a rate of interest that would be

set by FNB weekly; (2) they could invest in a "Certificate of Deposit" with an interest rate of

6.5% and a choice of maturity between three months to five years; or (3) they could transfer their funds to a "Maintenance Account" with all the features of the former MMIAs except that no additional deposits would be allowed. (*Id.*) Each plaintiff chose the third option "after being reassured that the account would forever maintain the guaranteed 6.5% rate." (*Id.* at 8.)

### B. BB&T's Transition to Ownership

On or about March 22, 1997, FNB merged with BankFirst of Tennessee ("BankFirst"). (*Id.*; Doc. 13, at 3.) BankFirst continued to pay 6.5% interest in connection with the Maintenance Accounts. (Doc. 1-1, at 8; Doc. 28, at 4.) On or about July 13, 2001, BankFirst merged with and began operating as part of BB&T. (Doc. 1-1, at 8.) BB&T was aware of the Maintenance Accounts and its obligations to former MMIA-holders. (*Id.* at 9.) On or about July 16, 2001, BB&T converted those accounts to Money Rate Savings Accounts ("MRSAs").[2] (*Id.*)

### C. Agreements Between Plaintiffs and BB&T

As part of its acquisition of BankFirst in 2001, BB&T provided a welcome letter to each Plaintiff and a "Bank Services Agreement." (Doc. 13, at 3.) The Bank Services Agreement stated that, by maintaining an account with BB&T, account holders agreed to the terms of the agreement. (*Id.*; Doc. 12-3, at 4.) The agreement further stated that its terms could be amended, that amendments would be accomplished by written notice to account holders, and that continued use of an account following notice of an amendment would constitute acceptance of the amendment. (Doc. 12-3, at 4.) The agreement also included an arbitration provision, which stated, "You and the Bank each have the option of requiring that any dispute or controversy concerning your account be decided by binding arbitration . . . ." (*Id.* at 9.)

---

[2] BB&T asserts that some of the former MMIAs were also converted into Investor Deposit Accounts (Doc. 13, at 3), though Plaintiffs do not reference any such accounts in their complaint (*see generally* Doc. 1-1).

BB&T amended the Bank Services Agreement in September 2004 (the "2004 Amendment"). (Doc. 13, at 4.) Among other things, the 2004 Amendment provided that, effective October 28, 2004, the existing arbitration section (Doc. 12-3, at 9) would be replaced with a new, longer section on arbitration (*see* Doc. 12-4, at 2–3). The new section stated:

> Any claim or dispute ("Claim") by either you or us against the other arising from or relating in any way to your account, this Agreement or any transaction conducted at the Bank or any of its affiliates, will, at the election of either you or us, be resolved by binding arbitration. This arbitration provision governs all Claims, whether such Claims are based on law, statute, contract, regulation, ordinance, tort, common law, constitutional provision, or any other legal theory and whether such Claim seeks as remedies money damages, penalties, injunctions, or declaratory or equitable relief.

(*Id.* at 3.) It further stated that "Claims subject to this arbitration provision include Claims regarding the applicability of this provision or the validity of this or any prior Bank Services Agreement." (*Id.*) The 2004 Amendment also stated that continued use of the account after the effective date of the amendment would constitute acceptance of the changes therein. (*Id.* at 2). BB&T sent notice and a copy of the 2004 Amendment to each customer, and Plaintiffs continued to use their accounts. (Doc. 13, at 4.)

On April 13, 2017, BB&T again amended the Bank Services Agreement (the "2017 Amendment"). (*Id.*) The 2017 Amendment made many changes to the Bank Services Agreement, including an amendment to the arbitration provision. The new provision began:

> IT IS IMPORTANT THAT YOU READ THIS ARBITRATION PROVISION CAREFULLY. IT PROVIDES THAT YOU MAY BE REQUIRED TO SETTLE A CLAIM OR DISPUTE THROUGH ARBITRATION, EVEN IF YOU PREFER TO LITIGATE SUCH CLAIMS IN COURT. YOU ARE WAIVING RIGHTS YOU MAY HAVE TO LITIGATE THE CLAIMS IN A COURT OR BEFORE A JURY. YOU ARE WAIVING YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT, CLASS ACTION ARBITRATION, OR OTHER REPRESENTATIVE ACTION WITH RESPECT TO SUCH CLAIMS.

(Doc. 12-5, at 4.) It went on to state:

Any dispute, claim, controversy or cause of action, that is filed in any court and that arises out of or relates to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration before one arbitrator at a location mutually agreed upon in the state where your account is maintained, or as may be otherwise required under the JAMS Minimum Consumer Standards, which is incorporated by reference herein. . . . If a party elects arbitration, it may be conducted as an individual action only. This means that even if a demand for a class action lawsuit, class arbitration, or other representative action (including a private attorney general action) is filed, the matter will be subject to individual arbitration. Either party may bring a summary or expedited motion to compel arbitration or to stay the applicable litigation of a dispute in any court. Such motion may be brought at any time, and the failure to initiate or request arbitration at the beginning of litigation shall not be construed as a waiver of the right to arbitration. . . .

(*Id.*) The new provision further stated:

You and the Bank each agree that under this Agreement, you and the Bank are participating in transactions involving interstate commerce which shall be governed by the provisions of the Federal Arbitration Act . . . and not by state law concerning arbitration. . . .

(*Id.* at 5.) The 2017 Amendment, again, provided that continued use of the account after receipt of the notice constituted acceptance of the changes (Doc 12-5, at 4), and Plaintiffs continued to use their accounts following the amendment (Doc. 13, at 5; *see also* Doc. 1-1, at 5).

BB&T sent notice of the 2017 Amendment to each customer. (Doc. 13, at 4.) The notice drew particular attention to the amendment of the arbitration provision, stating "The following paragraph replaces both the second and third paragraphs of the ARBITRATION AGREEMENT section of your Bank Services Agreement," and reproduces the above-reference paragraph that begins with "Any dispute, claim, controversy, or cause of action . . . ." (Doc. 12-6, at 2.)

From its acquisition of ownership in 2001 until January 2018, BB&T honored the 6.5% interest rate for the former MMIAs.[3] (Doc. 1-1, at 9.) Plaintiffs refrained from depositing

---

[3] The only time the interest rate dropped below the expected percentage was in December 2001, when, due to a system error, the interest rate on some accounts was briefly lowered to 3.32%.

additional funds into their MRSAs and did not transfer ownership of the accounts. (*Id.*) However, on or about January 30, 2018, Plaintiffs received notice that the annual percentage rate of their accounts would drop to 1.05% on March 10, 2018. (*Id.*) Plaintiffs were also informed that, after March 31, 2019, the rates would "automatically adjust to BB&T's standard balance tiers, as well as to the current standard variable rate of the interest and [annual percentage yield]." (*Id.* at 9, 26–27.) For all accounts with a balance of $1,000 or more, the "standard balance tiers" reflected an interest rate of 0.01%. (*Id.* at 10, 26–27.)

### D. The Present Action

On March 22, 2019, Plaintiffs filed this action in the Circuit Court for Sevier County, Tennessee, on behalf of themselves and all other persons similarly situated. (Doc. 1-1, at 1, 5.) Plaintiffs allege that BB&T is liable for breach of contract based on its actions in lowering the interest rate on March 10, 2018. (*Id.* at 10.) The action was timely removed to federal court, and, on June 3, 2019, BB&T filed its motion to dismiss and compel arbitration (Doc. 12), which is ripe for the Court's review.

## II. STANDARD OF REVIEW

The Federal Arbitration Act ("FAA") allows parties to a contract to agree that certain controversies arising from the contract shall be decided by an arbitrator rather than by a court. *See* 9 U.S.C. § 2. The primary substantive provision of the FAA is § 2, *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)), which provides, in pertinent part:

> A written provision in . . . a contract evidencing a transaction involving commerce
> to settle by arbitration a controversy thereafter arising out of such contract or
> transaction, or the refusal to perform the whole or any part thereof, or an

_____

(Doc. 1-1, at 9.) Upon discovering the error, BB&T notified the affected account holders, reset the interest rate, and repaid the lost interest. (*Id.* at 9, 24–25.)

agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. This section embodies "a liberal federal policy favoring arbitration." *AT&T Mobility*, 563 U.S. at 339 (quoting *Moses H. Cone*, 460 U.S. at 24). The principal purpose of the FAA is to ensure the enforcement of private arbitration agreements according to their terms, and the broader purpose of allowing parties to submit grievances to arbitration is to facilitate "efficient, streamlined procedures tailored to the type of dispute" at issue. *Id.* at 344 (citations omitted); *see also Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000) ("The FAA was designed to override judicial reluctance to enforce arbitration agreements, to relieve court congestion, and to provide parties with a speedier and less costly alternative to litigation.").

When considering a motion to dismiss and to compel arbitration, a district court is responsible for four tasks:

[F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

*McGee v. Armstrong*, --- F.3d ---, 2019 WL 5556756, at *4 (6th Cir. Oct. 29, 2019) (quoting *Stout*, 228 F.3d at 714). Here, Plaintiffs do not assert any federal claims, so only tasks one, two, and four are relevant to the Court's review. (*See* Doc. 1-1, at 10–11).

## III. ANALYSIS

BB&T argues that each plaintiff is required to arbitrate for three reasons. (Doc. 12, at 1.) First, BB&T contends that the 2001 Bank Services Agreement and amendments thereto established an agreement to arbitrate. (*Id.*) Second, BB&T contends that the arbitration

agreement is "valid, binding, and enforceable under the FAA." (*Id.*) Third, BB&T argues that the claims of each plaintiff fall within the arbitration agreement in the Bank Services Agreement. (*Id.*) Plaintiffs counter that: (1) they did not agree to arbitrate their disputes or waive their option to pursue their claims as a class; (2) any agreement between the parties was a contract of adhesion; and (3) the arbitration agreements therein are unenforceable. (Doc. 28, at 1–2.)

## A. Whether the Parties Agreed to Arbitrate

Under the FAA, arbitration is a matter of contract. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (citing *Rent-A-Ctr., West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). Thus, "courts must place arbitration agreements on an equal footing with other contracts . . . and enforce them according to their terms." *AT&T Mobility*, 563 U.S. at 339 (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006); *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)) (internal quotation marks omitted).

A party opposing arbitration may bring two types of validity challenges under § 2 of the FAA. *Rent-A-Ctr.*, 561 U.S. at 70; *Buckeye*, 546 U.S. at 444. The party may challenge the validity of the agreement to arbitrate or may challenge the validity of the larger contract in which the arbitration agreement appears. *Rent-A-Ctr.*, 561 U.S. at 70, *Buckeye*, 546 U.S. at 444. The Supreme Court has held that "only the first type of challenge is relevant to a court's determination whether the arbitration agreement at issue is enforceable." *Rent-A-Ctr.*, 561 U.S. at 70. Thus, when a party challenges the validity of the arbitration agreement, as opposed to the contract generally, the court must consider the challenge. *Id.* at 71; *see also Frizzell Constr. Co. v. Gatlinburg, LLC*, 9 S.W.3d 79, 84 (Tenn. 1999) ("[P]arties cannot be forced to arbitrate claims that they did not agree to arbitrate.'").

Here, Plaintiffs argue both that they never agreed to arbitrate and that, even if there was an agreement to arbitrate, such agreement is unenforceable. (Doc. 28, at 10, 18.)

### i. Whether the Parties Entered into an Agreement to Arbitrate

The formation of a valid contract in Tennessee requires both mutual assent and consideration. *Acuff v. Baker*, No. W2018-00678-COA-R3-CV, 2019 WL 211922, at *11 (citing Restatement (Second) of Contracts §§ 17, 22). Plaintiffs argue that they never assented to the alleged arbitration agreement and that any such agreement is not supported by consideration. (*See* Doc. 28, at 10–12, 18.)

### a. Mutual Assent

It is well settled that, "for a contract to be consummated, the parties must mutually assent to the material terms." *Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 528 (Tenn. 2012). To determine whether there was mutual assent, courts must objectively assess the parties' intent as manifested by their actions. *Id.* In this case, there is no dispute that each Plaintiff agreed to be bound by terms of the initial MMIA Agreement. (*See* Doc. 28, at 13–14.) Rather, the issue is whether their assent to the term in the MMIA Agreement that "changes in the terms of [the] agreement may be made by the financial institution from time to time" includes assent to the changes in the Banks Services Agreement and subsequent amendments. (*See* Doc. 12-2, at 2.) If not, the question becomes whether Plaintiffs are otherwise bound to the Bank Services Agreement and its amendments by virtue of their continued use of the accounts.

BB&T maintains that it had authority under the MMIA Agreement to add an arbitration provision in the Bank Services Agreement and the amendments. (Doc. 34, at 9.) It contends that it could amend the terms of the MMIA Agreement with thirty days' notice to the account

holders. (Doc. 13, at 3.) However, the MMIA Agreement actually stated that any changes to the terms of the agreement by the financial institution

> shall become effective upon the earlier of (a) the expiration of a thirty-day period of posting such changes in the financial institution, or (b) the mailing or delivery of notice thereof to the depositor by the notice in the depositor's monthly statement for one month.

(Doc. 12-2, at 2.) Plaintiffs argue that BB&T has not shown that the Bank Services Agreement, the 2004 Amendment, or the 2017 Amendment "were ever included in a monthly statement or posted at the bank branch as required by the [MMIA Agreement]."[4] (Doc. 28, at 5, 13 n.5.)

From the Court's own review of the record, it remains unclear whether these documents were distributed in a manner consistent with the MMIA Agreement. BB&T only asserts that: (1) it "provided" each Plaintiff with a welcome letter and copy of the Bank Services Agreement as part of the acquisition of BankFirst (Doc. 12-1, at 4; Doc. 13, at 3); (2) it "sent" notice of the 2004 amendment and a copy thereof to each Plaintiff (Doc. 12-1, at 4 (stating only that BB&T sent notice of the amendment); Doc. 13, at 4 (stating that BB&T sent notice and a copy)); and (3) it "sent" notice of the 2017 Amendment to each Plaintiff (Doc. 12-1, at 5; Doc. 13, at 4.) The Court is unable to determine whether these documents were sent "by the notice in the depositor's monthly statement" or otherwise posted in the bank as required by the MMIA Agreement.

Accordingly, the Court must consider whether the later agreements between BB&T and Plaintiffs are binding in their own right.

BB&T argues that Plaintiffs accepted the terms of the Bank Services Agreement, the 2004 Amendment, and the 2017 Amendment by their continued use of the accounts after the

---

[4] Plaintiffs also contend that the addition of an arbitration agreement was not contemplated by the language of the MMIA Agreement. (*See* Doc. 28, at 13 –14.) However, because the Court finds that BB&T did not follow the procedures for effectuating an amendment to the MMIA Agreement, it need not consider the substantive reasonableness of the change.

effective dates.  (Doc. 13, at 11.)  Plaintiffs counter that their inaction after receipt of the Bank

Services Agreement does not amount to assent to be bound by its terms.  (Doc. 28, at 10–12.)  It

is true that silence or inaction does not amount to acceptance of an offer, "unless the

circumstances indicate that such an inference of assent is warranted."  *Westfall v. Brentwood*

*Serv. Grp., Inc.*, No. E2000-01086-COA-R3-CV, 2000 WL 1721659, at *5 (Tenn. Ct. App. Nov.

17, 2000).  However, BB&T does not rely on Plaintiffs' silence or inaction as acceptance of the

terms of the Bank Services Agreement and the amendments.  Instead, it contends that the act of

continuing to maintain accounts with BB&T after the effective dates constituted assent to those

agreements.  (*See* Doc. 13, at 11.)

In Tennessee, "mutual assent need not be manifested in writing," but "may be

manifested, in whole or in party, by the parties' spoken words or by their actions or inactions."

*Burton v. Warren Farmers Co-op*, 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002) (citing *Cole-*

*McIntyre-Norfleet Co. v. Holloway*, 214 S.W. 817, 818 (Tenn. 1919)); *see also Moody Realty*

*Co., Inc. v. Huestis*, 237 S.W.3d 666, 674 (Tenn. Ct. App. 2007) ("The parties' actions or

inactions, as well as spoken words, can establish mutual assent.").  It follows that signatures of

the parties are not necessary to establish a binding contract, but are merely one form of evidence

of assent.  *Moody Realty*, 237 S.W.3d at 674 (noting that "other manifestations of assent can

serve the same purpose in the absence of signature").  "Whether an action constitutes acceptance

must be assessed in terms of whether it would lead a reasonable person to conclude that the offer

has been accepted."  *Rode Oil Co., Inc. v. Lamar Advertising Co.*, No. W2007-02017-COA-R3-

CV, 2008 WL 4367300, at *6 (Tenn. Ct. App. Sept. 18, 2008) (citations and internal quotations

marks omitted).  But mutual assent should not "be inferred from the unilateral acts of one party

or by an ambiguous course of dealing between the parties from which different inferences

regarding the terms of the contract may be drawn." *Burton*, 129 S.W.3d at 521 (citing

*Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. Ct.

App. 1990)).

While no Tennessee or related federal case directly addresses the circumstances at issue

in this case, other courts have found that continuing with a particular course of action can

constitute assent to contractual terms.

### 1. *Employment Cases*

Cases interpreting Tennessee law that have found that continued employment can amount

to assent to be bound by an agreement to arbitrate, even in the absence of a signature or other

express assent to the terms of the agreement. *See, e.g.*, *Seawright v. Am. Gen. Fin. Servs., Inc.*,

507 F.3d 967, 970 (6th Cir. 2007); *Fisher v. GE Med. Sys.*, 276 F. Supp. 2d 891, 895 (M.D.

Tenn. 2003).

In *Fisher*, the plaintiff had been employed by the defendant, and during his employment a

copy of the defendant corporation's dispute-resolution program was mailed to each employee.

276 F. Supp. 2d at 892. The program constituted "a written agreement for the resolution of

employment issues," which required that employees engage in mediation prior to filing suit in

court. *Id.* The plaintiff was aware of the program and had discussed it with other employees, but

did not remember ever receiving a copy of the program. *Id.* However, the written program itself

stated that individuals employed at the time of its implementation agreed, "by continuing [their]

employment" to abide by the plan "as a condition of employment." *Id.* (alteration in original).

The plaintiff nevertheless argued that he was not bound by the dispute resolution program,

because the program "was unilaterally imposed, lacked [the employees'] consent, and lacked the

consideration necessary to enforce a contract." *Id.* at 894.

The court found that the plaintiff was bound by the terms of the program. *Id.* at 896. In so finding, it first noted that, in Tennessee, "the terms of an employee handbook may become part of the employee's contract of employment, provided the plan demonstrates that both parties are bound by the rules and regulations therein," and that both the plaintiff and the defendant were bound by the dispute resolution program. *Id.* at 894–95. Second, the court concluded that the employees had agreed to the program procedures "by virtue of their continued employment." *Id.* at 895. The court observed that the plaintiff was aware of the nature of the dispute resolution program, though he claimed that he had not received a copy of it, and that such awareness rendered his continued employment "sufficient acceptance of the agreement to make it a valid contract." *Id.*

In *Seawright*, the United States Court of Appeals for the Sixth Circuit held that the plaintiff-employee's "knowing continuation of employment after the effective date of the arbitration program constituted acceptance of a valid and enforceable contract to arbitrate." 507 F.3d at 970. In that case, the defendant company initially introduced its dispute-resolution program "through a series of announcements and informational meetings," as well as letters and pamphlets that were sent to employees. *Id.* at 970–71. The plaintiff had signed an attendance sheet acknowledging that she had attended an informational session and received a copy of the pamphlet, but maintained that she never assented to the program. *Id.* at 971.

The Sixth Circuit observed that, "Tennessee law recognizes the validity of unilateral contracts, in which acceptance is indicated by action under the contract." *Id.* at 972 (quoting *Fisher*, 276 F. Supp. 2d at 895). It emphasized the fact that materials accompanying the arbitration agreement unambiguously stated that continued employment beyond the effective date of the program constituted acceptance of the agreement to arbitrate. *Id.* The court

distinguished the facts at issue from those in an unpublished Sixth Circuit case, *Lee v. Red Lobster Inns of Am., Inc.*, 92 F. App'x 158 (6th Cir. 2004), in which the court found that the plaintiff-employee had *not* entered into an agreement to arbitrate. *Seawright*, 507 F.3d at 973. First, the court observed that "the agreement at issue in *Lee* did not contain any provision that stipulated continued employment would constitute acceptances." *Id.*; *see also Lee*, 92 F. App'x at 163 n.4 ("The case at bar is distinguishable, of course, from cases in which employer-distributed materials told employees that their continuing to work would constitute acceptance of the employer's dispute resolution plan.") Second, it noted that "the plaintiff in *Lee* explicitly told her boss that she did not assent to the agreement," whereas the plaintiff in *Seawright* had not. *Seawright*, 507 F.3d at 973. The court was clear, though, that "[the plaintiff's] acceptance came not from her silence in the face of an offer, but from her performance under the contract— that is, her continued employment." *Id.* at 973 n.2.

Still, there are cases interpreting Tennessee law that have held that continued employment did not amount to mutual assent to an arbitration agreement. *See, e.g.*, *Lee*, 92 F. App'x at 162–63 (continued employment did not constitute assent when the agreement did not indicate that continued employment would constitute assent and the employee told her supervisor that she would not agree to arbitrate); *Walker v. Ryan's Family Steak Houses, Inc.*, 289 F. Supp. 2d 916, 935–36 (M.D. Tenn. 2003) (continued employment did not constitute assent when there was strong evidence that employees were given misinformation about the agreement they were signing and it was unclear whether they were ever provided with the material terms of the agreement). However, when the employee was provided with the agreement, the employee did not object to the terms of the agreement, and the agreement specifically stated that continued employment after the effective date would amount to acceptance of the terms of the agreement,

Tennessee law treats continued employment as assent to an agreement to arbitrate. *See Seawright*, 507 F.3d at 970; *Fisher*, 276 F. Supp. 2d at 895.

*2. Subscription-Service Cases*

Courts in neighboring jurisdictions have also treated the continued use of a subscription service as evidence of assent to the terms of the agreement governing that service. *See, e.g.*, *Schwartz v. Comcast Corp.*, 256 F. App'x 515, 518–20 (3d Cir. 2007); *Statchurski v. DirecTV, Inc.*, 642 F. Supp. 2d 758, 764–66 (N.D. Ohio 2009).

In *Stachurski*, the district court found that television-service subscribers agreed to be bound by the terms of the customer agreement, despite their contentions that they had neither read nor signed the agreement after receiving it. 642 F. Supp. 2d at 764–66. Though the agreement was "stuffed" into their billing statements and was in small type, the court found that the plaintiffs' failure to read the agreement, including the arbitration clause therein, did not defeat contract formation. *Id.* at 765. The court reasoned that, because the agreement stated that continuing to receive the service would amount to acceptance of the terms, the plaintiffs had agreed to the terms by continuing to use the defendant's services. *Id.* at 765–66 (noting that "Plaintiffs did not dispute the terms of the Customer Agreement or cancel Defendant's services after receiving a copy of the original Customer Agreement or any updated copy of the agreement").

In *Schwartz*, the United States Court of Appeals for the Third Circuit held that the plaintiff was bound by the terms of a subscriber agreement, including an arbitration clause, despite his contentions that he had not received a copy of the agreement, because: (1) the defendant service-provider produced evidence of its practice of distributing subscriber agreements; (2) the plaintiff knew the services were being offered pursuant to some agreement

with the defendant; and (3) both parties had performed under the agreement—the defendant had provided the service, and the plaintiff had paid the monthly fee. 256 F. App'x at 518–20. The court of appeals even opined that "[w]hether or not [the plaintiff] received a copy of the subscription agreement, he could not accept services he knew were being tendered on the basis of a subscription agreement without becoming bound by that agreement." *Id.* at 518.

On the other hand, some courts have declined to find that continued use of a subscription-based service constituted acceptance of service agreement. For example, in *Schnabel v. Trilegiant Corp.*, 697 F.3d 110 (2d Cir. 2012), the United States Court of Appeals for the Second Circuit concluded that the plaintiff was not bound to an arbitration agreement with an online discount provider when the only notice of the agreement to arbitrate was in an unsolicited email from the provider. *Id.* at 123. The court held that the email, which was received after enrollment, did not put the recipients on "inquiry notice of the terms enclosed in that email and those terms' relationship to a service in which the recipients had already enrolled, *and* that a failure to act affirmatively to cancel the membership will, alone, constitute assent." *Id.* (emphasis in original). The United States Court of Appeals for the Ninth Circuit similarly found that a subscriber to a satellite-radio service was not bound by an arbitration clause in the service's customer agreement when he became a subscriber upon the purchase of a new vehicle and had no knowledge or notice that he was entering into a contractual relationship with the radio service. *Knutson v. Sirius XM Radio, Inc.*, 771 F.3d 559, 566 (9th Cir. 2014) (noting that the plaintiff believed that the subscription "was a complimentary service provided for marketing purposes"). In both of these cases, the courts concluded that the plaintiffs were reasonably unaware that their actions would be covered by an agreement with the defendant at all. *See id.* ("A reasonable person in [the plaintiff's] position could not be expected to understand that

purchasing a vehicle from Toyota would simultaneously bind him or her to any contract with Sirius XM, let alone one that contained an arbitration provision . . . ."); *Schnabel*, 697 F.3d at 123 ("[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious.")

Taken together, these subscription-service cases indicate a trend toward finding assent based on continued use when the subscribers are on notice that use of the service would be governed by a contractual agreement with the service provider, as opposed to finding no contractual agreement based on continued use in the absence of such notice.

### 3. Application to This Case

Although these Tennessee cases do not directly control the resolution of the case at issue, they counsel toward finding that Plaintiffs assented to be bound by the arbitration agreement. Although they did not sign the agreement or confirm their assent in writing, the Bank Services Agreement and each of the amendments specifically stated that continuing to hold accounts with BB&T would operate as acceptance of the terms. (*See* Doc. 12-3, at 4; Doc. 12-4, at 2; Doc. 12-5, at 4.) In addition, BB&T has sufficiently demonstrated that Plaintiffs were provided with some form of notice regarding each version of the agreement. (*See* Doc. 13, at 3–4.) Individuals and organizations who maintain accounts at banks would reasonably expect their relationship with the bank to be governed by some sort of agreement and that a bank assuming new ownership would impose its own terms regarding that relationship. Moreover, Plaintiffs do not contend that any of them objected—throughout the course of nearly two decades—to the arbitration provisions in any of the agreements, nor do they contend that copies of the various agreements were unavailable to them at any time. On these facts, the Court finds that Plaintiffs'

continued use of their accounts without objection after the effective dates of the agreement amounts to assent to the terms of the Banks Services Agreement, the 2004 Amendment, and the 2017 Amendment. Because the 2017 Amendment is the most recent agreement to which Plaintiffs assented prior to filing this lawsuit, that version of the arbitration agreement is the one relevant the parties' dispute.

b.   Consideration

With respect to Plaintiffs' argument that the Bank Services Agreement and the amendments are not binding because there was no consideration for Plaintiffs' agreement to arbitrate and class action waiver (Doc. 28, at 18), the Court finds that there was adequate consideration to bind Plaintiffs to the terms of the agreements. In Tennessee, "[m]utuality of promises is 'ample' consideration for a contract." *Pyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351, 358 (Tenn. Ct. App. 2001). Accordingly, there is consideration for an arbitration agreement if both parties agree to be bound by the requirement to arbitrate certain claims. *See id.*; *see also Seawright*, 507 F.3d at 974. Because the arbitration provision in the 2017 Amendment bound both the account holders and the bank (*see* Doc. 12-5, at 4–5), there was adequate consideration for the provision.

***ii.  Whether the Agreement to Arbitrate is Enforceable***

The last clause of § 2 allows arbitration agreements to be declared invalid or unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This clause permits arbitration agreements, like other contracts, "to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability." *AT&T Mobility*, 563 U.S. at 339 (citations and internal quotation marks omitted); *Rent-A-Ctr.*, 561 U.S. at 68 (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).

Here, Plaintiffs argue that, even if there is an arbitration agreement between the parties, the agreement is an unenforceable contract of adhesion. (Doc. 28, at 18.)

<u>a.</u>   <u>Whether the Arbitration Agreement is Adhesive</u>

The Tennessee Supreme Court has defined a contract of adhesion as "a standardized contract form offered to consumers of goods and services on essentially a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or service except by acquiescing to the form of the contract." *Buraczynski v. Eyring*, 919 S.W.2d 314, 320 (Tenn. 1996) (quoting *Adhesion Contract*, Black's Law Dictionary (6th ed. 1990)[5]; *Broemmer v. Abortion Servs. of Phoenix Ltd.*, 840 P.2d 1013, 1015 (Ariz. 1992)).  The defining characteristic of such contracts in Tennessee is the difference in bargaining power between the two parties that enables one party "to select and control risks assumed under the contract" and leaves the other party with "no realistic choice as to its terms." *Id.*  (citations omitted).

However, "[a] contract is not adhesive merely because it is a standardized form offered on a take-it-or-leave-it basis." *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 500 (6th Cir. 2004). "Even after *Buraczynski*, Tennessee courts decline to find arbitration provisions adhesive where the consumer fails to prove that refusal to sign would cause some detriment other than not being able to buy from the particular merchant[.]" *Id.*  In *Wallace v. National Bank of Commerce*, 938 S.W.2d 684 (Tenn. 1996), the Tennessee Supreme Court held that certain "deposit agreements" between a bank and its account holders were not contracts of adhesion. *Id.* at 687–88.  It held

---

[5] The current version of Black's Law Dictionary defines "adhesion contract" as "[a] standard-form contract prepared by one party, to be signed by another party in a weaker condition, [usually] a consumer, who adheres to the contract with little choice about the terms." *Adhesion Contract*, Black's Law Dictionary (11th ed. 2019).

that, although the deposit agreements were standardized forms and the opportunity to open an account was presented on a "take-it-or-leave-it" basis, there was no basis for concluding that the plaintiffs lacked realistic choice as to the terms of their banking services because they did not show why they could not have simply opened accounts with other banks. *Id.* Similarly, in *Pyburn*, the Tennessee Court of Appeals found that an arbitration agreement between a car dealer and a purchaser was not adhesive because the purchaser could have refused to sign and gone to another car dealership to obtain the vehicle he wanted. 63 S.W.3d at 360.

Based on these Tennessee cases, the Court finds that the arbitration provision Bank Services Agreement, as amended by the 2017 Amendment, is not a contract of adhesion, because Plaintiffs retained the choice to open accounts with other banks. Nothing in the agreement restricted Plaintiffs' ability to close their accounts with BB&T and transfer their funds to accounts with other banks. Instead, by stating that continued use of their BB&T accounts would constitute acceptance of the terms, the agreements left open the option that Plaintiffs could reject the terms of the agreements—including the arbitration provisions—by transferring their funds to another bank. (*See* Doc. 12-3, at 4; Doc. 12-4, at 2; Doc. 12-5, at 4.)

Plaintiffs resist this conclusion, contending that they would have lost the favorable 6.5% interest rate had they elected to close their accounts. (*See* Doc. 28, at 23 ("Plaintiffs' desire was to enforce their contracts, not cancel them.").)

Even if, as Plaintiffs contend, their only recourse to avoid arbitration was to move their funds to other banks, they make no allegation that similar rates and services were not available at other banks. In holding that certain bank deposit agreements were not adhesive in *Wallace*, the Tennessee Supreme Court stated:

> It is common knowledge that the banking industry is very competitive. For example, different banks may charge lower fees for some services and higher fees

for other services, and they also may charge lower interest rates on loans but higher fees for services, thus providing choices which may appeal to various prospective customers. In the absence of a showing that there was no effective competition in the providing of services among the banks in the area served by the defendants, there is no basis for concluding that the appellants had no realistic choice regarding the terms for obtaining banking services.

938 S.W.2d at 688. Thus, the court's understanding of "choice" with regard to banking services incorporated the fact that different banks provide services at varying costs. *See id.* In addition, the court placed the burden of showing lack of realistic choice on the plaintiffs. *See id.* Here, Plaintiffs have failed to allege a lack of "effective competition" in the banking services available in Sevier County. Thus, the Court has no basis to find that Plaintiffs lacked "realistic choice."

Furthermore, even assuming no competitor offered a similar interest rate and Plaintiffs would have forgone the primary benefit of their agreements by moving their funds to a competitor, the fact remains that they took no action for years. There were other options available. They could have, for example, sought relief in court in 2001 when the concept of arbitration was first introduced to them, or within a reasonable time thereafter. Or they could have simply expressed disagreement with the arbitration provisions. They did neither. This lack of opposition to arbitration so long as the bank continued to pay the 6.5% interest rate is all the more reason to conclude that the arbitration provision was not adhesive. Plaintiffs cannot show that they lacked a "realistic opportunity to bargain" because they made no attempt at bargaining or challenging the provision while they were still receiving the favorable rate. *See Buraczynski*, 919 S.W.2d at 320.

Although the Bank Services Agreement and amendments were standardized forms and offered on a "take-it-or-leave-it" basis, Plaintiffs have failed to show that they were offered "under such conditions that [Plaintiffs] [could not] obtain the desired product or service except

by acquiescing to the form of the contract," and are, therefore, not contracts of adhesion.[6]

*Buraczynski*, 919 S.W.2d at 320.

### B.  The Scope of the Parties' Agreement to Arbitrate

#### i.  *Who Should Decide the Question of Arbitrability?*

Before determining whether the dispute falls within the scope of the arbitration agreement, the Court must first determine who should decide the threshold question of arbitrability.  *See Henry Schein*, 139 S. Ct. at 527.  The Supreme Court has held that this question itself is a matter of contract.  *Id.*  Under the FAA, it is perfectly permissible for parties "to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes."  *Id.* (citing *Rent-A-Ctr.*, 561 U.S. at 68–70; *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943–44 (1995)).  When parties agree by contract to delegate this threshold question to the arbitrator, the court must respect that

---

[6] Assuming the agreement is adhesive, Plaintiffs argue that the arbitration provision is unenforceable because it was beyond their reasonable expectations and is unconscionable.  (Doc. 28, at 21.)  They contend that they "did not have the opportunity to revoke or opt out of their contract with impunity" because they would have lost the 6.5% interest rate had they closed their accounts and that they were not given the opportunity to opt out of arbitration "with no adverse effect on their relationship with BB&T."  (Doc. 28, at 23–24.)  Plaintiffs also contend that the arbitration agreement was outside of their reasonable expectations because it was buried in the 27-page Bank Services Agreement and the even longer 2017 Amendment.  (*Id.* at 24–25.)

Though their arguments regarding unconscionability are couched in the assumption that the arbitration agreement is part of a contract of adhesion, the Court notes that the agreement between the parties is not unconscionable because, as previously stated, Plaintiffs were not denied meaningful choice of banking services.  *See Haun v. King*, 690 S.W.2d 869, 872 (Tenn. Ct. App. 1984) ("If the provisions are . . . viewed as so one-sided that the contracting party is denied any opportunity for a meaningful choice, the contract should be found unconscionable.").  Here, the terms were not so one-sided as to deprive Plaintiffs of meaningful choice whether to waive their right to a jury trial.  Instead, Plaintiffs chose to bank with BB&T even after receipt of notice of these terms, because they enjoyed the benefit of the 6.5% interest rate.

In addition, the inclusion of a class-action waiver in the arbitration agreement does not render it unconscionable or oppressive.  *See Pyburn*, 63 S.W.3d at 365 (holding that the trial court erred "when it determined that the unavailability of class action relief in arbitration was a valid basis for not enforcing" the arbitration agreement").

agreement.  *Id.* at 528; *see also id.* at 529 (noting that this "is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless").

Still, courts "should not assume the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so."  *Id.* at 531 (quoting *First Options*, 514 U.S. at 944).  The law reverses the presumption with regard to silence or ambiguity when the question is *who* should decide arbitrability rather than *whether* a particular issue is subject to arbitration.  *First Options*, 514 U.S. at 944–45.  When the question is who should decide arbitrability, silence and ambiguity militate in favor of the court deciding the threshold arbitrability question.  *Id.*; *Crossville Med. Oncology, P.C. v. Glenwood Sys., LLC*, 485 F. App'x 821, 823 (6th Cir. 2012).  Courts have held that written or otherwise vocalized objections to the arbitration of arbitrability show that a party did not clearly and unmistakably agree to submit the threshold question to the arbitrator.  *See First Options*, 514 U.S. at 945; *Crossville*, 485 F. App'x at 823–24.

Here, the arbitration agreement in the 2017 Amendment states that

> Any dispute, claim, controversy or cause of action, that is filed in any court and that arises out of or relates to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, *including the determination of the scope or applicability of this agreement to arbitrate*, shall be determined by arbitration . . .

(Doc. 12-5, at 4 (emphasis added).)  The agreement is neither silent nor ambiguous on this issue of who should decide whether a particular issue falls within the scope of the agreement—*i.e.*, is arbitrable.  (*See id.*)  Instead, the language is clear that such a question is itself subject to arbitration.  (*See id.*)  In addition, Plaintiffs have not objected at any point to the arbitration of the threshold question of arbitrability.  (*See generally* Doc. 28.)  Accordingly, the Court finds that the parties clearly and unmistakably agreed to have the arbitrator decide question of arbitrability, and will refrain from deciding this question itself.

### C. Whether to Stay or Dismiss Plaintiffs' Claims

The final issue for the Court to resolve is whether to stay or dismiss Plaintiffs' claims pending arbitration. *See McGee*, 2019 WL 5556756, at *4. Courts in this circuit have recognized that dismissal, rather than a stay of proceedings, can be appropriate when all of the claims in a particular suit will be referred to arbitration. *See Ozormoor v. T-Mobile USA, Inc.*, 354 F. App'x 972, 975 (6th Cir. 2009); *Jacobs Field Servs. North Am., Inc. v. Wacker Polysilicon North Am., LLC*, 375 F. Supp. 3d 898, 915 (E.D. Tenn. 2019); *Doe #1 v. Déjà vu Consulting, Inc.*, No. 3:17-cv-00040, 2017 WL 3837730, at *17 (M.D. Tenn. Sept. 1, 2017). Here, all claims and issues are subject to arbitration, and Plaintiff does not request a stay of the action rather than dismissal. Therefore, the Court concludes that dismissal is appropriate.

### IV. CONCLUSION

For the reasons stated above,

1. BB&T's motion to dismiss and compel arbitration (Doc. 12) will be **GRANTED**;

2. It will be **ORDERED** that the parties proceed to arbitration;

3. This action will be **DISMISSED WITHOUT PREJUDICE**; and

4. Plaintiffs' motion for corrective relief pursuant to Federal Rule of Civil Procedure 23(d) (Doc. 42) will be **DENIED AS MOOT**.

**SO ORDERED.**

*/s/ Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**